## SONJA I. BAK vs. ANTHONY BAK.
## (and a companion case[1]).

Hampshire. May 11, 1987. — August 12, 1987.

Present: GREANEY, C.J., CUTTER, & ARMSTRONG, JJ.

*Divorce and Separation*, Custody of child, Foreign determination as to custody of child, Division of property, Alimony. *Probate Court*, Custody of child, Jurisdiction. *Jurisdiction*, Custody of child.

In a divorce proceeding, the Probate Court clearly had subject matter jurisdiction under G. L. c. 209B to make a child custody determination where the Commonwealth was the home state of the child at the time of commencement of the proceeding and where there were then no pending custody proceedings elsewhere or other previous valid custody determination. [613-614]

A probate judge properly exercised his discretion in declining to stay child custody proceedings and defer to a German court, inasmuch as the Probate Court had jurisdiction and the judge had considered each of the factors relevant to the issue of deferral set forth in G. L. c. 209B, § 7. [615-616]

In a divorce proceeding, no ground appeared for reversal of a probate judge's order for custody of the parties' two children. [616-619]

In a divorce proceeding, no error appeared in the judge's division of property, which awarded to the wife the parties' only joint asset, a $20,000 stock account, but awarded her no interest in certain real estate which apparently had been kept outside the marital partnership by tacit agreement of the parties, where disposition of the real estate was based on an appropriate evaluation of relevant factors under G. L. c. 208, § 34, and was not plainly wrong. [620-621]

An award of alimony was remanded for further consideration where the husband's annual income had risen considerably and unforeseeably due to a change in the foreign exchange rate since the entry of the original order. [621-623]

A probate judge was warranted in finding that a husband conveyed certain real estate to his mother in anticipation of imminent divorce proceedings in order to insulate it from claims of the wife, and a judgment was properly entered forbidding conveyance, transfer or encumbrance of the property in order to secure the payments of alimony awarded in the divorce action between the parties. [624-625]

[1] Sonja I. Bak *vs.* Anthony Bak and Esther Bak.

COMPLAINT for divorce filed in the Hampshire Division of the Probate and Family Court Department on September 30, 1980.

CIVIL ACTION commenced in the Hampshire Division of the Probate and Family Court Department on November 18, 1980.

The cases were heard by *Sean M. Dunphy*, J.

*Elizabeth A. Zeldin* for Anthony Bak & another.

*Wendy Sibbison* for Sonja I. Bak.

GREANEY, C.J.    After trial of these actions in the Probate and Family Court for Hampshire County, two judgments were entered. The first granted Sonja I. Bak a divorce from Anthony Bak, awarded Sonja custody of Rosemary and Anthony, Jr., two of the three minor children of the parties,[2] divided the marital property, and made awards of alimony and child support. The second judgment enjoined Anthony and his mother, Esther Bak, from "encumbering, transferring or conveying" property in Truro. Anthony has appealed from the custody award in the first judgment. Sonja has appealed from the property division and alimony portions of that judgment, and from the order on her request for attorney's fees. Anthony and Esther have appealed from the second judgment concerning the Truro property.

## I. CUSTODY.

We state the facts at some length, drawing principally from the judge's findings. The Baks were married in June, 1967. Sonja was then a secretary in Connecticut and Anthony a graduate student in mathematics at Columbia University. For the first year of the marriage, Sonja supported the couple while Anthony earned his doctorate. After that time, Sonja did not work outside of the home.

Following graduation, Anthony wanted to teach but was unable to obtain a permanent faculty position. For the next six academic years the Baks traveled the world so that Anthony could advance his career. They spent time at a school in Paris,

---

[2] The Baks' older daughter, Linnea, was sixteen when the divorce action was first tried. She chose to stay with her father, and Sonja has agreed to defer to her wishes.

at Princeton University, at the State University of New York at Stony Brook, at Princeton again, the University of Geneva, and, finally, the University of Bonn. By the fall of 1974, the Baks had two children; Linnea, born in Sweden during the summer of 1969, and Rosemary, born in Bonn in the spring of 1974. In the fall of 1974, Anthony obtained a tenured position on the faculty of the University of Bielefeld, in Bielefeld, the Federal Republic of Germany. The Baks moved to a small village near the University and later moved into Bielefeld proper. The couple's third child, Anthony, Jr. (Tony), was born in Bielefeld in March, 1976.

The marriage was never a particularly happy one. Sonja testified that Anthony was given to fits of rage that appeared irrational to her. At other times, Anthony devoted himself single-mindedly to his career and showed no interest in her or the children. Sonja was also unhappy because she believed that Anthony frequently had relationships with other women.

Sonja has had a history of emotional problems and, at various times before and during the marriage, she has been hospitalized or otherwise treated for the problems. Sonja also did not like being overseas. During the five years the Baks were in Bielefeld, she made no attempt to learn German or to join the university community. Instead, Sonja traveled regularly, usually with the children, to visit family members in the United States. During the marriage she was the childrens' primary caretaker.

In 1979, Anthony accepted a fellowship at Oxford University. He went to England in February, while Sonja and the children remained at the family home in Bielefeld. While at Oxford, he met a woman who is also a professor (of philosophy) at the University of Bielefeld, and they started a relationship. When Anthony visited Bielefeld in May, 1979, he told Sonja that he would no longer live with her. He soon returned to Oxford to be with his companion. He had already told his mother about his new relationship, and that it was permanent. Anthony and his companion intend to marry as soon as this divorce is final. They have a child who is seven years old.

In August, 1979, Sonja took the children to the home of her mother-in-law, Esther, in Northampton. Shortly after she arrived, she applied to the Probate Court for separate support and for custody of the three children (then ten, five, and three). In September, 1980, Sonja filed a complaint in the Probate Court seeking a divorce, a property division and alimony, and custody of the children.

Sonja eventually moved her family into an apartment in Amherst. The older children began school, while Sonja started taking classes part-time at the University of Massachusetts. Later, she enrolled there full-time, pursuing a bachelor's degree in art, with the goal of becoming an art teacher. During this period, Anthony visited his family frequently, and, at least as far as the children were concerned, a mutual trust developed among the parties.

In 1983, Sonja and Anthony agreed that the children should be encouraged to maintain a relationship with their father. They planned for Linnea to go to Bielefeld for the summer. Linnea's visit went without incident, and she returned to Amherst in the fall. Sonja then agreed to a similar arrangement with respect to Tony, who did not know his father very well because he was three when his parents separated. Sonja allowed Tony to go to Bielefeld for the 1983-1984 school year. In return, Anthony promised to bring Tony back to Massachusetts for a visit at Christmas and to return him to Sonja at the end of the school year.[3] Anthony broke his promise and did not return Tony to his mother.

Instead, in May, 1984, after Tony had been in Bielefeld for slightly over six months, Anthony filed a petition for custody in the Bielefeld Family Court. Although he did not inform the Bielefeld court, or the Probate Court, that the parties were now involved in duplicate custody proceedings, the Bielefeld

---

[3] Anthony argues that this agreement, testified to by Sonja, was not established by competent evidence. He contends that it was proved in violation of the spousal disqualification. He fails to mention that not only did he not object below, but also he elicited the testimony on cross-examination of Sonja. Absent objection, the evidence was admitted for its full probative value. See *MacDonald's Case*, 277 Mass. 418, 422 (1931).

Family Court did send notice of its proceedings to Sonja. The notice was in German, and Sonja apparently did not understand what it meant. She obtained orders from the Probate Court directing Anthony to return Tony to Amherst and further directing him not to remove Rosemary or Linnea from the Commonwealth. However, in the fall of 1984, Anthony took Linnea to Germany without the permission of either Sonja or the Probate Court.

On August 24, 1984, the Bielefeld Family Court entered an order granting Anthony custody of Tony. Sonja had not participated in the German proceedings, and the German judge apparently believed that she did not wish to contest custody. By coincidence, however, Sonja's attorney in Massachusetts sent a letter on August 25, 1984, advising the Bielefeld Family Court of the pending Probate Court action and indicating that Anthony was in violation of several court orders. Sonja's attorney also informed the German court of a pending criminal complaint against Anthony for interference with the Probate Court's custody orders.

The Bielefeld Family Court chose to treat Sonja's attorney's letter as an appeal from its custody order and forwarded the record to the Appeals Court in Hamm. On October 9, 1984, that court quashed the custody order and remanded the case to the Bielefeld Family Court to determine whether the Federal Republic of Germany or the Probate and Family Court for Hampshire County had jurisdiction. The Appeals Court in Hamm also ordered that Sonja was to be furnished an opportunity to participate in any custody determination. It appears that the Bielefeld Family Court has not yet reached a final decision.[4]

After his refusal to return Tony, Anthony substantially reduced his contacts with Massachusetts. In 1983, for the first time in several years, he did not visit Northampton over Christmas. He failed to file any pleadings in the divorce proceedings in the Probate Court until the first day of trial in November,

---

[4] That court has, however, entered orders granting Anthony temporary custody of Linnea and Tony.

1985, a trial he did not attend. He also refused to cooperate with a court-ordered investigation by a family service officer of the Probate Court. After the separation in 1979, he sent no money to Sonja for her support until 1983, when the Department of Public Welfare brought an action against him. Even then, he did not pay regularly, and arrearages of over $6,000 accumulated. Similarly, he built up arrearages of over $4,000 in child support payments. Anthony was eventually adjudged in contempt of outstanding support orders. He satisfied the arrearages in the spring of 1984, when he petitioned the Probate Court to reopen the evidence in the divorce proceedings.

In December, 1984, Sonja traveled to Germany, engaged a lawyer, and participated in the German custody proceedings. She was allowed to have supervised visits with Linnea and Tony. Once she attempted to visit the children at Anthony's home, but she was physically ejected. In November and December, 1985, the Hampshire County Probate Court held four days of hearings. Anthony chose not to attend the hearings but was represented at them by counsel.

On January 21, 1986, Sonja had Tony abducted and taken out of Germany. Later that year, Anthony returned to the United States and moved in the Probate Court to reopen the evidence. That motion was granted, and two days of additional testimony were presented. The Probate Court granted custody of Rosemary and Tony to Sonja.

1. *Jurisdiction.* Anthony argues that under the Massachusetts Child Custody Jurisdiction Act, G. L. c. 209B, inserted by St. 1983, c. 680, § 1, the courts of the Commonwealth lack subject matter jurisdiction over the question of Tony's custody.[5]

---

[5] The parties treat jurisdiction as governed by G. L. c. 209B. General Laws c. 209B became effective on January 20, 1984. The divorce action was commenced on September 30, 1980. We need not decide, however, whether jurisdiction should be decided under the law as it stood in 1980 or under G. L. c. 209B. The result is the same. Prior to the enactment of G. L. c. 209B, the only requirement for jurisdiction in custody disputes was that the children be residents of Massachusetts. See *Gil* v. *Servizio,* 375 Mass. 186, 189 (1978) (Probate Court had jurisdiction to decide custody where children were in Commonwealth for only two days before the petition was filed). Residency meant "expected permanence in way of personal

The Probate Court clearly had jurisdiction under G. L. c. 209B. A Probate Court "has jurisdiction to make a custody determination . . . if . . . the commonwealth . . . is the home state of the child on the commencement of the custody proceeding . . . ." G. L. c. 209B, § 2(a)(1)(i). A "'[c]ustody proceeding', includes proceedings in which a custody determination is one of several issues presented for resolution, such as an action for divorce . . . ." G. L. c. 209B, § 1. "'Home state' [is] the state in which the child immediately preceding the date of the commencement of the custody proceeding resided with . . . a parent . . . for at least 6 consecutive months . . . ." *Ibid.* This divorce was commenced on September 30, 1980, after the children had been in Massachusetts for thirteen months.[6] Since there were no pending custody proceedings elsewhere, see G. L. c. 209B, § 2(d), and no previous valid custody determination, see G. L. c. 209B, § 2(e), the Probate Court had subject matter jurisdiction. See *Custody of a Minor (No. 3)*, 392 Mass. 728, 733, 734.[7] Nothing argued by Anthony dissuades us from this conclusion.

---

presence . . . intended continuance as distinguished from speedy change." *Aufiero* v. *Aufiero*, 332 Mass. 149, 153 (1955), quoting from *Marlborough* v. *Lynn*, 275 Mass. 394, 397 (1931). At the time this divorce action was commenced, the Bak children had lived in Massachusetts for thirteen months, had attended Massachusetts schools, and were expected to remain. The Probate Court clearly had jurisdiction as the law stood in 1980. See *Conley* v. *Conley*, 324 Mass. 530 (1949) (Mere physical presence gives the State some jurisdictional interest). On the question of which law to apply, see *Custody of a Minor (No. 3)*, 392 Mass. 728 (1984) (applying G. L. c. 209B to an action filed three days before the statute's effective date); *Redding* v. *Redding*, 398 Mass. 102 (1986) (G. L. c. 209B applied where amended complaint filed approximately one month before statute's effective date); *Cranberry Realty & Mortgage Co.* v. *Ackerley Communications, Inc.*, 17 Mass. App. Ct. 255, 258-261, nn.3 and 5 (1983) (retroactive application of a jurisdictional statute).

[6] We reject Anthony's argument that the divorce complaint was insufficient to raise the custody issue. Sonja completed the space in the form complaint which indicated that she was seeking custody of the children. This is the manner designated by the Probate and Family Courts for a party to seek custody and, notwithstanding Anthony's arguments, it is an adequate method for stating the complaining party's custody claim.

[7] Anthony's additional argument that jurisdiction should be determined at some time other than at the commencement of the custody proceedings

2. *Deferral to the German court.* Anthony also argues that, if the Probate Court had jurisdiction over the question of Tony's custody, it was an abuse of discretion for the judge not to stay the proceedings and defer to the Bielefeld Family Court.[8] The judge considered whether he should defer to the German court but chose not to do so. As long as the Probate Court had jurisdiction, the question whether to exercise that jurisdiction was one committed to the judge's sound discretion. See G. L. c. 209B, § 7. We perceive no abuse of discretion.

The judge considered each of the factors set forth in G. L. c. 209B, § 7, as relevant to the issue of deference.[9] He found that prior to the initiation of divorce proceedings Tony had

---

lacks merit. Any such rule would be contrary to the language of G. L. c. 209B and would violate the purposes of the Uniform Child Custody Jurisdiction Act, 9 U.L.A. 111 et seq. (Master ed. 1979), on which c. 209B is based, by allowing a party to shift jurisdiction between States by moving children illegally. In similar circumstances, other jurisdictions have reached analogous conclusions. See *Berry* v. *Berry*, 466 So.2d 138 (Ala. 1985); *Kelly* v. *Warner*, 119 Ill.App.3d. 217 (1983); *Bull* v. *Bull*, 109 Mich. App. 328, 339-340 (1981). See, e.g., Uniform Child Custody Jurisdiction Act § 6, 9 U.L.A. 134 (clear statement that the court that is petitioned second should defer to court in which proceedings first commenced). The case Anthony relies on, *Barden* v. *Blau*, 712 P.2d. 481 (Colo. 1986), also supports this conclusion. In that case, the court decided that in considering jurisdiction over a petition for modification of a custody order, the court should look at the commencement of the modification proceeding, rather than the commencement of the original divorce proceeding. That result was required by the statute. Compare G. L. c. 209B, § 2(*e*). There is no suggestion in the decision that jurisdiction should be allowed to shift in the middle of any given proceeding.

[8] We assume, for the purposes of this appeal, that it may be proper to defer to custody proceedings in a foreign country. However, the language of G. L. c. 209B, § 14, is cast in terms of a foreign "determination," not foreign proceedings. Cf. Uniform Child Custody Jurisdiction Act § 23, 9 U.L.A. 167 (Master ed. 1979).

[9] The factors described in § 7 are as follows: (1) whether another State is, or recently was, the child's home State; (2) whether another State has closer contacts with the child and one or more of the parties; (3) whether more substantial evidence concerning the child's present or future care, protection, training, and personal relationships is available, or whether such evidence is more available in another State; (4) whether the parties have agreed on another forum which is not less appropriate; and (5) whether the exercise of jurisdiction would contravene any of the purposes of G. L. c. 209B.

lived here for four years. He attends school here and has his friends here. Massachusetts was Tony's home when the divorce proceedings were initiated and for several years thereafter. The judge also found that substantial evidence was available in Massachusetts concerning Tony's present and future needs and care. This conclusion is supported by Tony's presence before the court and by the ready availability of relevant German court documents. Finally, the judge could correctly conclude that retaining jurisdiction over Tony's custody would not violate the purposes of G. L. c. 209B.[10]

3. *Custody*. Finally, Anthony maintains that the grant of custody of Rosemary and Tony to Sonja was wrong. A Probate Court judge must settle custody in a manner that advances the best interests of the children. *Rolde* v. *Rolde*, 12 Mass. App. Ct. 398, 402 (1981), and cases cited. The decision of which parent will promote a child's best interests "is a subject peculiarly within the discretion of the judge." *Jenkins* v. *Jenkins*, 304 Mass. 248, 250 (1939). *Vilakazi* v. *Maxie*, 371 Mass. 406, 409 (1976). In this situation, "[t]he opportunity which the judge had to observe and appraise both parents is particularly important." *Stevens* v. *Stevens*, 337 Mass. 625, 627 (1958). For the most part, Anthony's arguments that he should have custody of both children merely rehearse evidence which the judge, as fact finder, did not credit or find persuasive.

As concerns Rosemary's custody, the judge's decision has considerable support. She has lived with her mother since her parents' separation in 1979. She is in good health, except that

---

[10] Under § 7 of c. 209B, the purposes of the Act and any illegal or wrongful conduct of a party are entitled to consideration. As has been indicated, see note 7, *supra*, the purposes of the Act clearly point toward the Probate Court's exercising jurisdiction. If we treat Germany as we would a sister State, Massachusetts would have jurisdiction because if Sonja had demonstrated to the courts of another State that Massachusetts had prior pending proceedings, that State would have deferred to the Probate Court. On the other hand, coming to a clear conclusion based solely on the wrongful or illegal acts of the parties is more difficult, as each party has acted improperly. However, while Massachusetts' jurisdiction is not based on the wrongful act of a party, Germany's would be, in view of Anthony's violations of an agreement and of court orders to return Tony.

at the time of trial she needed some dental work. She has attended school in Amherst for seven years and has substantial roots in the community. She apparently has a good relationship with her grandmother, who lives nearby. Sonja is clearly fit to be a custodial parent. It would be in the best interests of Rosemary and Tony to have a continuing relationship with both parents, a result which the judge found could be more easily achieved if the children resided with their mother in Massachusetts in view of Anthony's greater ability and propensity to travel.

Tony's custody presents a closer question. His father appears to have indoctrinated him with some dislike for his mother, and he has expressed a preference for Bielefeld. Furthermore, his familiarity with his father's life in Bielefeld, something Rosemary lacks, might possibly make sending him to his father less traumatic. On balance, however, the judge's decision, founded on a better knowledge of the parties than we can achieve from a cold record, is not plainly wrong.

The preference of someone Tony's age (ten at the time of the proceedings) is not given decisive weight, although it is a factor to be considered. See *Dumain* v. *Gwynne*, 10 Allen 270, 275 (1865); *Stone* v. *Duffy*, 219 Mass. 178, 182 (1914); *Custody of a Minor*, 383 Mass. 595, 601-602 (1981); *Yannas* v. *Frondistou-Yannas*, 395 Mass. 704, 713 (1985); *Hale* v. *Hale*, 12 Mass. App. Ct. 812, 820 (1981). The judge could give consideration to the report of one of the court's family service officers that Tony had not suffered any emotional damage as a result of his forced removal from Germany. That officer also found Tony to be "a very bright, honest, and articulate 9-year old" who, although he wishes to return to Germany, "has adapted well to his new school" in Amherst, and has weathered the dissension between his parents.

Many of the reasons why Rosemary's interests are better served by staying with her mother apply equally to Tony. He has now been in Amherst since January, 1986, and he has spent most of his life there. He has been attending the Amherst school system and has adapted well. He, too, has a support system in place, including friends, doctors, and relatives. The

judge placed a good deal of weight on the very close relationship between Rosemary and Tony. He found that both children are better off together, other factors being equal. This is significant, as Rosemary and Tony are closer in age than Tony and Linnea. Whatever benefit there might be in a continuing relationship with both parents may be better served by granting custody to Sonja. Anthony has close ties with Massachusetts. His mother lives near the children and has affection for them; Anthony has a vacation home in Truro. Now that the dust has settled, Anthony may resume his practice of visiting during the summer and at the Christmas holiday. As has been noted, Sonja has neither the resources nor the inclination to visit Bielefeld regularly.

Finally, Sonja has made a considerable effort to provide Rosemary and Tony with a cultural background. She has arranged, at some sacrifice to herself, music and dance lessons for them as well as several other constructive and enriching activities. She has taken advantage of the numerous activities offered in Amherst and by the colleges and universities nearby. At the present time, Anthony and his companion may be able to offer the children a life of greater material comfort than Sonja can. The judge found, however, that Sonja's present and prospective income is sufficient to allow the children a reasonable standard of living. The readjustment in alimony that we order should help to assure that status. Material advantage alone should not be determinative of custody. To make it so might unfairly punish the less affluent party. Material advantage and successful child rearing do not necessarily go hand in hand.

Finally, we note the judge's stated intention of making contact with his counterpart in the Bielefeld Family Court to construct a joint order on visitation. It is the judge's laudable desire that Anthony have reasonably liberal visitation rights which may be exercised both in Germany and this country. We hope that an order with complementary terms can be arranged by the two courts which will allow both parents maximum time with their children in a cooperative effort to rear them. This would clearly be in the childrens' best interests and would permit them the unique opportunity to share in the

many benefits of university locations in two countries. Careful oversight of any such order should eventually overcome the present distrust that exists between the parents.

## II. PROPERTY DIVISION AND ALIMONY.

The judge made detailed findings, as required by G. L. c. 208, § 34, which disclose the following as to the parties' financial situation. Anthony, who is forty-three, earns 5,800 marks a month from the University.[11] The woman with whom he lives earns a similar salary as a professor and has substantial assets. They live in a home which the woman owns with her ex-husband. Anthony does not pay rent. He has additional income from lecturing, research, and rental of the family property in Truro, which was valued by stipulation of the parties at $115,000. He receives money from his mother. He owns an automobile worth $800, and has bank accounts of undisclosed amounts in both Northampton and Bielefeld. He owes an $18,000 debt to a Bielefeld bank. He has the prospects of a fairly substantial inheritance from his mother and may advance further in his academic field.

Sonja is fifty years old. Her only recent employment has been as a store clerk at $90 a week. At the time of the judgment, she was close to receiving an undergraduate degree and hoped to work as an art teacher. She has doubts about finding a teaching position immediately. Sonja owns an automobile worth $500 and stocks worth $8,000, which were purchased with an inheritance from her parents. She has a bank account in Northampton with a fluctuating, but small, balance. She also owns a small cabin in Sweden, apparently worth very little, because it has no running water or inside plumbing. As of the date of the judgment, she owed approximately $17,000 in educational loans, about $1,500 in attorney's fees, and

---

[11] While Anthony is paid in marks, he pays Sonja in dollars. Based on the exchange rate stated in the Wall Street Journal on the day he testified, his yearly salary was equivalent to a little more than $30,000. When the judge's findings were made, the dollar equivalent of his salary was approximately $35,000. In June, 1987, his salary was about $39,000.

$19,000 to the Department of Public Welfare.[12] She has little prospect of acquiring assets. The parties only joint asset is a stock account worth $20,000.

The judge ordered Anthony to transfer to Sonja the $20,000 stock account. The rest of the parties' assets and liabilities were left untouched. As alimony, Anthony was ordered to pay $10,000 immediately, and to make five annual payments of varying amounts, starting in 1988.[13] The payments are secured by an order preventing Anthony from encumbering or transferring the Truro property. In addition, Anthony was ordered to pay $120 a week in child support for Rosemary and Tony. Sonja apparently must pay (or provide for) medical and dental expenses for the two children living with her because the judgment is silent on the points.

Sonja argues that the property division is improper because she was not given all or a portion of the Truro real estate and because the judge's reasons for leaving that property undivided are inadequate. "If a judge has made findings consistent with his obligations under G. L. c. 208, § 34 (*Rice* v. *Rice*, 372 Mass. 398, 402-403 [1977]), indicating that he has fairly considered all factors relevant under § 34 and has not considered any irrelevant matter, his determinations as to . . . property division may not be reversed unless 'plainly wrong and excessive.' See *Ross* v. *Ross*, 385 Mass. 30, 37-38 (1982); *Bianco* v. *Bianco*, 371 Mass. 420, 422-423 (1976); *Robbins* v. *Robbins*, 16 Mass. App. Ct. 576, 579 (1983). The judge's reasons for his conclusions, however, must be apparent in his findings and rulings. Any failure in the decision-making process to consider and explain the effect of an important fact may require

---

[12] When she arrived in Northampton, Sonja obtained welfare payments without fully disclosing her assets. The department discovered the lack of adequate disclosure and has demanded repayment. The amount found by the judge as owed to the department was apparently stipulated by Sonja and a representative of the department.

[13] The amounts to be paid are as follows: $6,875; $6,500; $6,125; $5,750; and $5,350. Assuming a 7.5% interest rate, the present value of the total award at the time of the first payment is $35,000. The future payments were "to be guaranteed by a promissory note . . . secured by a mortgage deed on the property at Truro."

reversal of the judgment in order to permit consideration and explanation of the omitted subject." *Redding* v. *Redding*, 398 Mass. 102, 107-108 (1986). See also *Putnam* v. *Putnam*, 5 Mass. App. Ct. 10, 15-17 (1977).

The judge made detailed findings of fact, and the reasons for his division of the marital property are apparent. The judge decided that the Truro property should not be conveyed to Sonja, or sold and the proceeds divided in some way, because the property had not been the marital home and had long been a Bak family home used not only by Anthony but also by his mother and uncle. The judge also found that Sonja had "made little or no contribution to the . . . property." Title to the property stood in Anthony's name alone. The judge, in effect, appears to have considered the asset as one which had been kept outside the marital partnership by tacit agreement of the parties. The judge also thought that the property should stand as security for the payments of alimony. This may be important, as Anthony has a poor record of keeping current with his payments. Disposition of the Truro property is based on appropriate evaluation of relevant factors under § 34, and we cannot say it is clearly erroneous. If the Truro property is not included, the $20,000 stock account given to Sonja constitutes the major portion of the parties' assets.

The reasons for the judge's award of alimony are also disclosed in his decision. They are as follows. Sonja is within a few credits of earning her undergraduate degree in art. She hopes to obtain a teaching certificate and thereafter a position teaching art. According to the judge's findings, once she obtains that position it will "be several years before she begins to earn a salary approaching that of Mr. Bak's." Assuming she remains in good health and employed as a teacher, she will have fifteen years to contribute to a retirement plan. She must pay close to $40,000 in debts and attorney's fees. The award of six years of alimony is intended to put her in a position where she can become independent.

The alimony award is in the nature of "rehabilitative alimony." As its name implies, this form of alimony is designed to protect, for a limited time, a spouse whose earning capacity

has suffered (or become non-existent) while that spouse prepares to reenter the work force. Rehabilitative alimony is viewed with some circumspection in Massachusetts[14]. See *Zildjian* v. *Zildjian*, 8 Mass. App. Ct. 1, 15-17 (1979). Compare *Drapek* v. *Drapek*, 399 Mass. 240, 247-248 (1987).

The judge attempted to fashion an award which would enable Sonja to become self-sufficient, and which was fair to Anthony, in the circumstances confronting both of them at the time of the divorce. The judge undoubtedly had in mind that Sonja could seek a modification if some of the predictions for her future failed to materialize. This approach was prudent as the record leaves speculative whether a fifty year old woman in Sonja's present position might be able to obtain employment in the art education field (most likely at the secondary level) in the Amherst area at a salary which would eventually approximate the compensation paid to a tenured university professor.

We need not dwell on the adequacy of the award, about which Sonja complains bitterly, as there is a new development which, in our opinion, merits remand of the alimony question for the judge's further consideration. Anthony's annual income from his position as a professor has risen considerably. See note 11, *supra*. The increase is due mainly to the substantial increase in the value of the German mark rather than the payment of a higher salary. Nevertheless, the fact remains that at the present time Anthony's compensation is considerably higher in relation to the alimony award than it was at the time

---

[14] The danger of conceptualizing alimony following a long marriage as rehabilitative lies in the fact that a spouse who has been absent from the work force may not easily obtain worthwhile employment and as a result may be actually left "only marginally independent." *Zildjian* v. *Zildjian*, 8 Mass. App. Ct. 1, 15 (1979). In a marriage during which the wife has remained out of the work force for some time and has been the primary caretaker of the children (while the husband advanced his career), her likelihood of becoming self-sufficient has to be considered with care. Unless "rehabilitation" is proved probable, the husband's "support responsibilities [may be] of extended duration . . . This has nothing to do with feminism, sexism, male chauvinism or any other trendy social ideology. It is ordinary common sense, basic decency and simple justice . . .." *Marriage of Brantner*, 67 Cal. App. 3d 416, 419-420 (1977). See also Weitzman, The Divorce Revolution 187-194 (1985).

of the hearings. This improvement (essentially unforeseen when the evidence was received) could have a tangible effect on Anthony's ability to pay alimony in dollars.

We therefore vacate the portion of the judgment awarding alimony and direct reconsideration of the award in light of the foregoing development and the present circumstances of the parties. Current financial information should be obtained from both parties. In Anthony's case that information should include the present value of his salary, his bank accounts, earnings from outside activities, and any moneys received from other sources such as rental of the Truro property. If possible, more information as to the income and assets of Anthony's companion (whom he intends to marry) should also be obtained as her resources may be taken into account reasonably, in the judge's sound discretion, in assessing Anthony's total financial picture. See *Schuler* v. *Schuler*, 382 Mass. 366, 377-378 (1981). See also *Silvia* v. *Silvia*, 9 Mass. App. Ct. 339, 342 (1980), and cases cited.

The reconsideration should take into account Sonja's present needs and the necessity of having a reasonable plan to reduce her debt. That plan may include some use of the funds in the stock account given to her by the judgment. At the same time, the judge should consider (as he undoubtedly did before) Anthony's obligation to support Linnea and his son by his current relationship. As the child support payments may be intertwined with the alimony award, we shall vacate also the child support order to give the judge the necessary flexibility to deal with the whole picture of alimony and child support in light of the parties' current situation. The present orders for alimony and child support are to remain in effect until a new judgment is entered. Finally, we also direct the judge to reconsider Sonja's request for additional counsel fees for past services and for the services in connection with this appeal. Reconsideration of this question should be conducted in light of the principles discussed in *Grubert* v. *Grubert*, 20 Mass. App. Ct. 811, 819-820 (1985).

In ordering the remand, we do not imply that rehabilitative alimony is necessarily wrong for this case. Nor do we seek to

imply what the ultimate alimony and child support awards should be. These matters remain within the considerable discretion of the judge, who has done a commendable job of handling a difficult case. There should, of course, be a statement of reasons accompanying the decision after remand.

### III. CONVEYANCE OF THE TRURO PROPERTY.

Anthony and his mother, Esther, appeal from the judgment that forbids them to convey, transfer, or encumber the Truro property without prior leave of the Probate Court. The judge found, with ample record support, that in June, 1979, in anticipation of his separation and divorce from Sonja, Anthony made a trip to Boston and conveyed the Truro house from his name to Esther's. Sonja was not informed of the conveyance. Although the deed accomplishing the transfer recites a consideration of $35,000, no money was ever paid, nor was any payment expected. The judge concluded that, in effect, Esther had been given the property to hold in trust for Anthony until after the divorce. The court entered an injunctive order barring Anthony or Esther "from encumbering, transferring, or conveying all or any portion of the real estate . . . without the express authorization of this court" until such time as alimony payments had been completed.

Under the Uniform Fraudulent Conveyance Act, G. L. c. 109A, a creditor can petition to set aside any conveyance made without "fair consideration," see G. L. c. 109A, § 3, which, is "made . . . with actual intent . . . to hinder, delay or defraud either present or future creditors." See G. L. c. 109A, § 7. "[W]here a divorce is imminent, a spouse may be a 'creditor' under the . . . Act, . . . entitled to complain of conveyances designed to frustrate the right to alimony or assignment of property. *Jordan* v. *Ball*, 357 Mass. 468, 470-471 (1970). *Tsomides* v. *Tsomides*, 3 Mass. App. Ct. 750 (1975)." *Dumont* v. *Godbey*, 382 Mass. 234, 237 (1981).

The judge applied these principles to a finding that the property had been conveyed in anticipation of imminent divorce proceedings in order to insulate it from any claim by Sonja. The finding is well supported. In challenging the finding, Anthony and Esther restate evidence that the judge either chose not

to credit or which he deemed irrelevant. In particular, Anthony's claim that the divorce proceedings were not anticipated or close in June, 1979, has no basis, in view of what was known to him and what occurred.[15] The purpose of the judgment concerning the Truro property was to ensure that Sonja would receive the six payments of alimony due her. This is why this judgment interlocked with the divorce judgment, which provided that the Truro property should be used as security for the alimony. In view of our determination that Sonja may receive more traditional alimony, the judge may wish to provide for some limitation on the period during which the property must stand as security for alimony payments. We shall affirm that judgment as it stands, with the judge to make whatever change in it he deems advisable under the authority reserved to him by that judgment.

The sixth, seventh, and eighth paragraphs of the judgment of divorce nisi (as amended) providing for child support and alimony are vacated. The matters dealt with in these paragraphs are to stand for further proceedings consistent with this opinion. The balance of that judgment is affirmed. The judgment in the case concerning the Truro property is affirmed.

*So ordered.*

---

[15] The arguments that Esther has always owned the house because she furnished the money to pay for it, and that the conveyance simply recognized the fact that Anthony held title in trust for her, was not made below and need not be considered here. In the probate judge's discretion, he may give the matter further consideration on remand.