ROGER A. FREEDMAN *vs.* IPPOLITA S. FREEDMAN.

No. 98-P-1399.

Norfolk. February 11, 2000. - June 27, 2000.

Present: KASS, GREENBERG, & LENK, JJ.

*Divorce and Separation,* Child custody, Alimony, Child support, Division of property, Agreement respecting life insurance. *Parent and Child,* Custody, Child support. *Probate Court,* Divorce, Custody of child.

A judge of the Probate Court had authority under G. L. c. 208, § 28, to order joint legal custody of a child, and his findings supported his order for a shared custody arrangement that was carefully tailored to the particular situation of the parties. [521-522]

An award of alimony was not demonstrated to be either excessive for its indefinite term or inadequate in its amount. [523]

An order of child support was not demonstrated to be excessive. [523]

In a divorce action, there was no error in the judge's orders regarding division of property, life insurance, or attorney's fees. [524]

COMPLAINT for divorce filed in the Norfolk Division of the Probate and Family Court Department on March 8, 1994.

The case was heard by *Christina L. Harms,* J.

*Elizabeth R. Lewis* for Roger A. Freedman.

*James R. DeGiacomo* (*Joan P. Armstrong* with him) for Ippolita S. Freedman.

KASS, J. Both parties to a divorce action have appealed from the judgment. Of the various points they raise on appeal, the one with an element of novelty is whether a Probate Court judge may, as to the couple's minor child, order a joint legal custody arrangement that requires the child to change his primary residence on an annual basis. We affirm that order as well as the other contested elements of the judgment of divorce.

1. *Facts.* The trial judge made comprehensive findings of fact, for which there is support in the record. Roger A. Freedman (Roger) and Ippolita S. Freedman (Ippolita) met when she, age twenty, was a sophomore at Wellesley College and he, age

thirty-nine, was a bachelor living in a house in Wellesley. The couple began living together in 1990 and were married May 28, 1992. At that time Ippolita had completed her bachelor of arts degree at Wellesley and planned to take an advanced degree in art history at Brown University. Their child, a son, was born the following October.

Roger had equity interests in a family real estate business (consisting of various partnerships and corporations) that was largely managed by his sisters and his mother. The business required little of Roger's time or attention, but the cash draws that the Freedman siblings made from time to time were significant. In the late 1980's, for example, each sibling drew approximately $300,000 per year for three successive years. In many years, however, it was the practice of the business partners to retain earnings against foreseeable business needs, so that there would be more taxable income than there was cash flow.

During the time they were together, the life style of the couple was markedly affluent. In addition to the Wellesley house, which had a swimming pool, they had a second house in Gloucester. They employed domestic help. Roger's taste in cars ran to Ferraris (he owned two), a BMW, and an Alfa Romeo.

The marriage soured quickly, and, by the spring of 1994, each brought a divorce action against the other, Roger having fired the first salvo in March, 1994. The divorce trial took place on five days in December, 1996, and two days in January, 1997. Judgment of divorce nisi entered on February 3, 1997.

2. *The judgment.* As both parents loved their child dearly and were good parents to him, the judge ordered joint legal custody. Roger, for the balance of the 1996-1997 school year and the entire 1997-1998 school year, was to have custody from the end of the school day on Friday to the beginning of the school day on Monday. For the 1998-1999 school year, the arrangement would reverse, with Ippolita to have custody during the Friday afternoon - Monday morning span and Roger during the school week span. The idea was to give the child stability during each school year and to avoid the "today is Tuesday, I must be going to Mom's house" phenomenon. There were included in the custody orders detailed provisions for vacations, where the child would go to school, that neither parent would disparage the culture or religion of the other, and so forth.

Financial provisions in the judgment required (a) Roger to pay $400,000 to Ippolita as a lump sum property division; (b)

Roger to pay $40,000 to Ippolita's counsel for counsel fees; (c) Roger to pay to Ippolita $1,000 alimony per month; (d) Roger to pay $3,000 per month to Ippolita for child support; (e) Roger to pay $36,000 to Ippolita for reasonable expenses incurred in obtaining her master's degree; (f) Roger to maintain comprehensive medical insurance for the child until his emancipation; (g) Roger to provide comprehensive medical insurance for Ippolita as long as he has an alimony obligation; and (h) Roger to maintain a $1,000,000 life insurance policy payable to Ippolita as long as he has financial obligations to her or the child.

3. *Correctness of the custody order.* The primary attack that Ippolita makes on the custody component of the judgment is that it is, in substance, a "shared legal custody" arrangement, a defined term in G. L. c. 208, § 31, and that a judge may order shared legal custody only upon the submission by the parents at trial of a "shared custody implementation plan." See G. L. c. 208, § 31, eleventh par.

We think that a too restricted reading of the statutory scheme. Within § 31 itself, in the ninth paragraph, authority is conferred on the trial judge to make an order for shared legal custody, provided that such an order is supported by written findings. Moreover, G. L. c. 208, § 28, as amended by St. 1975, c. 400, § 29, authorizes a Probate Court judge, upon a judgment for divorce, to make "such judgment as [the judge] considers expedient relative to the care, custody and maintenance of the minor children of the parties." The powers conferred on Probate Court judges to make custody arrangements that are expedient are not impliedly limited by the option afforded to divorcing parents by § 31 to proffer to the court a shared legal custody plan of their own devising.

Appellate courts have interpreted the statutory power to make expedient custody orders as conferring upon Probate Court judges broad discretion. To the exercise of that discretion appellate courts give deference, recognizing that the Probate Court judge has had the opportunity to observe and appraise both parents in custody matters. *Stevens* v. *Stevens*, 337 Mass. 625, 627 (1958). *Vilakazi* v. *Maxie*, 371 Mass. 406, 409 (1976). *Kendall* v. *Kendall*, 426 Mass. 238, 251 (1997), cert. denied, 524 U.S. 953 (1998). There are limits to appellate deference. Error of law apparent on the record, such as the failure of a judge's findings to support the judge's action or findings that have no support in the evidence, would constitute an abuse of discretion.

*Vilakazi* v. *Maxie, supra.* The guiding principle in the exercise of discretion is the best interests of the child. *Ibid. Rolde* v. *Rolde,* 12 Mass. App. Ct. 398, 404-405 (1981).

Within the judge's careful findings are those that describe that the couple's son has done well in a de facto shared custody arrangement following the separation of the parents. Notwithstanding the hostility and tension attendant on their divorce, Ippolita and Roger were able to come to terms, albeit after some rancor about the subject, on where the child should go to preschool. Both parents are loving and capable. Consistency for the child, the judge wrote, would be accomplished by continuation of the sharing arrangement he had come to know, rather than the creation, by judicial order, of a "predominant parent" and a "visiting parent."[1] Splitting the school week imposed difficulty on the child; hence a weekday custodian and a weekend custodian, but with alternation of those assignments to avoid the predominant parent and visiting parent dichotomy.

The potential practical difficulty in the custodial plan drawn by the judge is that one parent may move a significant distance from Wellesley, where the child was going to school at the time of trial. Arrangements for the care and custody of children of divorced couples, however, inevitably raise difficulties: the pressure for parents to stay geographically near one another being one of them.[2] The task of the Probate Court judge is not to find the perfect custody solution but to devise one that best accommodates to the difficulties and the child's interest. In that respect the judge in this case has done a creditable job. Cf. *Adoption of Hugo,* 428 Mass. 219, 225 (1998), cert. denied, 526 U.S. 1084 (1999). The arrangement is tailored to the particular facts of the case and is not to be viewed as a template. Should experience demonstrate that yearly alternating of the weekday and weekend custody assignments is not operating in the best interests of the child, the Probate Court has the power to reexamine the arrangement, as an adverse effect on the child would constitute a material change in

---

[1]The judge had before her a report from a guardian ad litem but found the report "unhelpful in addressing the best interests of [the child]." In particular, the judge criticized the report for its maternal preference.

[2]We do not consider in the abstract — nor have the parties asked us to — how the "real advantage" analysis described in *Yannas* v. *Frondistou-Yannas,* 395 Mass. 704, 710-712 (1985), would be applied in the case of joint custodial parents, were either ever to petition to move the child out of Massachusetts.

circumstances. *Ardizoni* v. *Raymond*, 40 Mass. App. Ct. 734, 737-738 (1996).

4. *Correctness of the financial orders.* (a) *Alimony.* Roger claims that the judge erred in ordering him to pay indefinite alimony of $1,000 per month, rather than rehabilitative alimony. Ippolita, for her part, claims that the alimony award is wrong because it is paltry in relation to Roger's wealth.

Here again, we examine the exercise of broad discretion, which we will not reverse unless plainly wrong or excessive. *Heins* v. *Ledis*, 422 Mass. 477, 481 (1996). Rehabilitative alimony — an award of support to enable a spouse to become economically self-sufficient — may be appropriate to a short term marriage (this one effectively lasted less than two years). *Mailer* v. *Mailer*, 390 Mass. 371, 375 (1983). *Drapek* v. *Drapek*, 399 Mass. 240, 247-248 (1987). *Moriarty* v. *Stone*, 41 Mass. App. Ct. 151, 158-159 (1996). Alimony so limited is not, however, an invariable requirement, particularly when the marriage has produced a child. The purpose of alimony is to provide support. *Gottsegen* v. *Gottsegen*, 397 Mass. 617, 623 (1986). *Williams* v. *Massa*, 431 Mass. 619, 634 (2000). *Grubert* v. *Grubert*, 20 Mass. App. Ct. 811, 819 (1985). Considering Roger's wealth, Ippolita's untested employability, and the manner in which the parties lived while married, the alimony award is not assailable either on grounds of extravagance or duration, on the one hand, or its inadequacy, on the other.

(b) *Support.* As to its inadequacy, the alimony cannot be viewed in isolation. The judge provided $3,000 per month in child support, so that the aggregate monthly income that Ippolita could count on was $4,000 per month. This was clear of the child's education and medical expenses, for which Roger remained liable, and as to the support component, free of income tax. In providing for a high ratio of support to alimony payments, the judge took into account the income tax consequences. *Sheskey* v. *Sheskey*, 16 Mass. App. Ct. 159, 162 (1983). *Griffith* v. *Griffith*, 24 Mass. App. Ct. 943, 945-946 (1987).[3] Roger complains that the support payments are too high. As to the over-all level of payments, the judge, in her rationale for the financial awards, see *Bowring* v. *Reid*, 399 Mass. 265, 267-268 (1987), wrote that she sought to avoid the castle and hovel

---

[3]The judge also directed that Ippolita shall be entitled to the dependency exemption for the child beginning with the 1996 tax returns.

dichotomy, i.e., while Ippolita would not be living as luxuriously as Roger, the home that she was to maintain for the child ought not to be wretched by comparison with that of the father. See, e.g., *Hager* v. *Hager*, 6 Mass. App. Ct. 903, 904 (1978).

(c) *Other financial orders*. The award of $400,000 in assets for Ippolita was expressly designed to provide, literally, a nest egg, a means by which Ippolita could rent or buy a place to live. This was a reasonable allocation of resources to deal with the castle and hovel issue; it would not attain the former but would avoid the latter. The order for life insurance was a reasonable contingency provision and, given the comparatively sparse resources available to Ippolita at the time of trial, was neither excessive nor erroneous because it did not provide for a reduction of coverage over time. Life insurance may be seen as a component of alimony and other payment requirements. See *Robbins* v. *Robbins*, 16 Mass. App. Ct. 576, 579 (1983). Compare *Wooters* v. *Wooters*, 42 Mass. App. Ct. 929, 931 (1997).

On reviewing the financial components of the judgment, we are satisfied that the judge made findings about, and considered, the factors set forth in G. L. c. 208, § 34. The judge's goal was that Ippolita should live comfortably, if not comparably to her marital life style. The judge could take into consideration that the marriage had not lasted long enough to attain the character of a marital partnership. See *Williams* v. *Massa*, 431 Mass. at 632. We have considered other points raised on appeal, such as the justice of the order that Roger pay $40,000 (over and above a larger sum that he had already paid prior to trial) for counsel fees to Ippolita's law firm. This, as the other financial orders, was within the range of the judge's discretion. *Moriarty* v. *Stone*, 41 Mass. App. Ct. at 159. We shall not disturb the exercise of that discretion.

*Judgment affirmed.*