## Custody of Zia.[1]

No. 00-P-355.

Bristol. June 7, 2000. - October 13, 2000.

Present: Brown, Smith, & Greenberg, JJ.

*Parent and Child,* Custody. *Minor,* Custody. *Evidence,* Child custody proceeding. *Probate Court,* Custody of child, Findings by judge, Judicial discretion.

In a child custody proceeding, the judge did not abuse her discretion or otherwise err in concluding that it was in the child's best interests to be placed in the legal and physical custody of the father [241-245]; further, the judge's findings of fact were supported by the evidence and in turn supported her conclusions of law and her order [245-246].

The record of a child custody proceeding disclosed no statements, actions, or conduct on the part of the judge to support a claim of gender-based partiality toward the father, or of ethnic, cultural, or class bias on the part of the judge. [246-247]

In a child custody proceeding, evidence of the father's "offer" to assume full responsibility for the child's care and schooling was properly admissible as relevant to the child's best interests. [247]

In a child custody proceeding, there was no merit to the mother's claim that the judge unduly pressured her to reach an agreement with the father concerning custody. [247-248]

CIVIL ACTION commenced in the Bristol Division of the Probate and Family Court Department on November 4, 1996.

The case was heard by *Elizabeth O. LaStaiti,* J.

*Christopher R. Whittingham (Lynda Cook* with him) for the mother.

*Mary Alice McLaughlin (Elaine I. Kantrowitz* with her) for the father.

*Allan G. Rodgers & Marilyn Lee-Tom* for Massachusetts Law Reform Institute, amicus curiae, submitted a brief.

BROWN, J. This case involves a dispute between a mother and father concerning the custody of their child born out of wedlock.

---

[1] A fictitious name.

A judge of the Probate and Family Court, on the father's complaint to establish paternity (the question of paternity is not at issue), awarded the father sole legal and physical custody of the child. The mother has appealed. We affirm the judgment.

1. We summarize the findings of the probate judge. The mother and father began a romantic relationship in 1995 that resulted in the child's birth in August, 1996. At the time of the birth, the mother was nineteen years of age and the father was twenty-one. The mother has been the child's primary physical caretaker while the father has exercised substantial visitation with the child.

The father was raised in Brookline and attended school there; he has attended college for one year. He currently works as a patient service representative and is enrolled in a graphic design program at a local university. The father's parents, one of whom is black, the other white, are well educated professionals. The father has had legal problems, including his convictions for assault and battery (not involving the mother or child) and a drug offense. Two abuse protection orders (discussed more fully, *infra*) have been issued against him. There is also pending against the father an assault and battery charge.

The mother was born in Puerto Rico and came to Massachusetts at the age of nine. (The mother speaks both English and Spanish.) She lives in New Bedford. Since arriving in the Commonwealth she has resided, with her mother or with the child, in public housing. The mother dropped out of high school in the eleventh grade because of an earlier pregnancy[2] but she later received her GED as well as employment training in several areas. In addition, she has worked as a cashier, cook, translator, and at a cranberry bog facility. Although the mother stopped working after the child's birth, she obtained full time temporary employment at a rubber company during the course of trial. The mother has been arrested for possession of drugs (class A) (for which she ultimately was placed on probation) and for driving without a license.

As a result of a stipulation and temporary order dated November 4, 1996, the parties agreed to share legal custody of the child with physical custody in the mother. Both the mother and father have actively participated in the child's care. The

---

[2]The mother had two earlier pregnancies, one ending in a miscarriage, the other in a stillbirth.

father has regularly exercised visitation with the child, seeing and taking her in excess of 140 days per calendar year. The father's visitation takes place at his parents' home in Brookline where he receives assistance from his parents.[3] The child maintains a strong relationship with the paternal grandparents and, the judge found, benefits from their society and companionship and the cultural and intellectual stimulation they provide her. Although the father's visitation takes place at his parents' home, he is the child's "primary caregiver" during the visits. "He makes her meals and feeds her. He dresses her and makes sure she's clean and has brushed her teeth. He fixes her hair. He puts her to bed." The child spends "the vast majority of her time" with the father during visitation and looks to him for comfort.

The father has also encouraged physical and mental stimulation of the child, taking her on walks and rides and visiting, for example, the circus, the zoo, and the aquarium. The father has shown himself to be interested in the child's early education as well. In addition to providing the child with books, he offered to enroll her at a day care center in Brookline when the mother's day care vouchers were terminated.[4] Although the father was willing to pay for the child to resume day care in Brookline and, in exchange, give up his weekend visitation, the mother refused the offer. The father loves the child, who is "attached" to and has "bonded" with him.

The mother, as we have indicated, has been the primary caretaker for the child. She resides in a clean, well-furnished apartment, and, in general, has taken good care of the child "physically." Indeed, the parties stipulated that the child is "happy and well adjusted" and that her "mental, physical and intellectual development is appropriate for her age." The mother has lived with her own mother (who often cares for the child)

[3]The father resides at an apartment in Boston. His parents' home is larger than his apartment, has a nice backyard, and is closer to parks and other children. The father testified that if he was granted physical custody of the child, he would either move in with his parents or move into an apartment located in the lower level of his parents' home.

[4]The child had earlier attended a day care program near the mother's home in New Bedford which was paid for by welfare vouchers. Although the child was frequently absent from the program (due, the judge found, to the "probability that both [m]other and child were too tired [from late bedtimes] to get ready for school in the morning"), the child enjoyed the interaction and stimulation that she received in day care and benefited from it.

in the past and appears to have a good relationship with her. While the mother is at work, the child is cared for by the mother's seventy-four year old grandmother. As with the father, the mother loves the child and the child is "attached" and "bonded" to her.

Notwithstanding the positive attributes of the mother's care of the child, the judge had serious concerns about the mother's judgment, parenting abilities, and interactions with the father. The judge found that the mother has "dismissed the need of [the child] for a [f]ather"[5] and has "thwarted his joint legal custody at every turn." "She has denied him information about and input into the most important decisions and events concerning the child: medical issues, hospitalizations, attendance at pre-school, selection of pre-school educational programs, all to the detriment of [the child]." The judge found that the mother believes that she alone can make important decisions in the child's life.

In addition, the judge found that there was a lack of structure in the mother's home and that the mother failed adequately to set rules or to establish boundaries. The judge stated, for example, that the mother allows the child to go to bed between 10 P.M. and 10:30 P.M. (as opposed to the more appropriate bedtime of 8 P.M. imposed by the father), to sleep with her on a regular basis, and to watch television constantly. The judge also found that the mother has had the child in bed with her and her boyfriend, a practice which the judge viewed as inappropriate and harmful. Moreover, the judge found that the mother, on occasion, had engaged in conduct that simply was not in the child's best interests. Such conduct includes the mother's arriving to pick up the child at the home of the paternal grandparents (1) without a car seat and (2) in a vehicle driven by a relative who was drinking an alcoholic beverage.

The judge also voiced her concern that the mother, through her own lack of education and willingness to learn, fails to recognize the value of education or the child's need for stimulation and enrichment. In this regard, the judge noted that the mother has done "little if anything on her own initiative to stimulate or enrich" the child, and had rejected the father's offer to resume day care for the child (a decision, in the judge's

---

[5]The judge noted also that the mother had made statements to the guardian ad litem "clearly indicating her opinion that a father is not a necessary or important figure for a child."

view, that was not in the child's best interests). Indeed, the judge found, as we have indicated, that the child rarely does anything in the mother's care but watch television, including adult-oriented talk shows. Finally, the judge commented critically on the mother's inability to obey court orders as manifested by her failure to complete a court-ordered parenting class (that the father has successfully completed) and her attempts to thwart the father's joint legal custody.[6]

On these findings, and others, the judge concluded that it was in the child's best interests to award sole legal and physical custody to the father.[7] Conversely, the judge concluded that awarding physical and legal custody to the mother would not be in the child's best interests. The judge emphasized that "[a]ccess for the child to each parent is an important consideration for the [c]ourt" and that, while the mother has consistently denied the father participation in fundamental decisions concerning the child, the father has respected the mother's role as a parent and has "demonstrated that he will not deny [the child] access to [the] mother." Furthermore, the judge stated that the mother has demonstrated poor parenting decisions regularly and consistently throughout the child's life while the father has always acted appropriately as a parent. In the judge's view, the mother has had "difficulty navigating life's waters even on her own account. The probability of [her] doing a better job for her child is minimal to nonexistent."

2. The mother argues that the judge failed to give "proper weight" to her role as primary caretaker of the child as required

---

[6]The judge also made findings concerning the reports and testimony of the guardian ad litem and the testimony of the mother's expert. The judge noted that the guardian ad litem, in her final report, had recommended that, although the parties sometimes had difficulty communicating, "joint legal and physical custody would be best because it would ensure that information is shared between the parties." The judge noted further that the mother's expert believed that the mother was a good parent and, although the mother was young and made some poor decisions, those decisions did not harm the child. In the expert's opinion, the mother's family could provide her with the guidance she needs to raise the child. The judge also found the expert's opinion to be flawed as she did not meet with the father during her evaluation.

[7]Although the judge awarded the father sole legal and physical custody of the child, she ordered that he keep the mother "well informed and provide her with the opportunity to have input" into all major decisions involving the child, including those concerning the child's education, health and religion. The mother was also awarded visitation with the child as specified in a parenting schedule.

by G. L. c. 209C, § 10(*a*), as amended through St. 1998, c. 179, § 6.[8] At the outset, we decline the mother's request, suggested at oral argument (and that of the amicus, the Massachusetts Law Reform Institute), that we create, presumably through interpretation of § 10(*a*), a *presumption* that custody should be awarded to the primary caretaking parent. Indeed, we have stated, in the context of c. 209C, that a parent's role as a primary caregiver "should not be afforded substantial weight without a determination as to the quality of that care." *R. H.* v. *B. F.*, 39 Mass; App. Ct. 29, 42 (1995), *S.C.* sub nom. *Custody of Vaughan*, 422 Mass. 590 (1996). Moreover, where the Legislature has intended that custody issues be viewed with reference to a judicial presumption, it has clearly so stated. See, e.g., G. L. 208, § 31A, & G. L. c. 209C, § 10(*e*) (a judge's "finding by a preponderance of the evidence, that a pattern or serious incident of abuse has occurred shall create a rebuttable presumption that it is not in the best interests of the child to be placed in sole custody, shared legal custody, or shared physical custody with the abusive parent"); G. L. c. 208, § 31 ("There shall be no presumption either in favor of or against shared legal or physical custody at the time of the trial on the merits, except as provided for in section 31A"). See also *Adoption of Hugo*, 428 Mass. 219, 231-232 n.21 (1998), cert. denied sub nom. *Hugo P.* v. *George P.*, 526 U.S. 1034 (1999) (in considering widest range of permissible evidence in child custody cases, court should not give presumptive consideration to one factor or another when

---

[8]Section 10(*a*) provides:

"Upon or after an adjudication or voluntary acknowledgment of paternity, the court may award custody to the mother or the father or to them jointly or to another suitable person as hereafter further specified as may be appropriate in the best interests of the child.

"In awarding custody to one of the parents, the court shall, to the extent possible, preserve the relationship between the child and the primary caretaker parent. The court shall also consider where and with whom the child has resided within the six months immediately preceding proceedings pursuant to this chapter and whether one or both of the parents has established a personal and parental relationship with the child or has exercised parental responsibility in the best interests of the child.

"In awarding the parents joint custody, the court shall do so only if the parents have entered into an agreement pursuant to section eleven or the court finds that the parents have successfully exercised joint responsibility for the child prior to the commencement of proceedings pursuant to this chapter and have the ability to communicate and plan with each other concerning the child's best interests."

Legislature has not recognized a presumption as such); *Opinion of the Justices*, 427 Mass. 1201 (1998) (discussing the constitutional ramifications of creating a presumption in child custody matters); Kindregan & Inker, Family Law and Practice §§ 47.12 & 47.12.1 (2d ed. 1996 & Supp. 2000). Here, there is no such clarity of expression on the part of the Legislature.

The mother argues, in the alternative, that G. L. c. 209C, § 10(*a*), establishes a "preference" for retaining custody with the primary caretaker, see *Rolde* v. *Rolde*, 12 Mass. App. Ct. 398, 405-406 (1981) (parent's role as "primary nurturing parent" and "primary caretaker" is highly significant in determining the welfare of a child); *Zatsky* v. *Zatsky*, 36 Mass. App. Ct. 7, 13 (1994) (where court made reference to wife's role as a "nurturing mother"); *Carr* v. *Carr*, 44 Mass. App. Ct. 924, 925 (1998), cert. denied, 525 U.S. 1073 (1999) (where court considered mother's role as primary caretaker of the child), and that the judge erred in removing the child from her temporary custody where the child was fit, happy, and well adjusted.

"[C]ustody orders and judgments [including those under G. L. c. 209C] are made on the basis of a determination of the best interests of the child . . . ." *R. H.* v. *B. F.*, 39 Mass. App. Ct. at 39. See *Bak* v. *Bak*, 24 Mass. App. Ct. 608, 616 (1987); *Carr* v. *Carr*, 44 Mass. App. Ct. at 925; *Freedman* v. *Freedman*, 49 Mass. App. Ct. 519, 522 (2000), and a judge may consider any factors found pertinent to those interests in the circumstances of the dispute. See *R. H.* v. *B. F.*, 39 Mass. App. Ct. at 40; *Rosenberg* v. *Merida*, 428 Mass. 182, 191 (1998); *Ardizoni* v. *Raymond*, 40 Mass. App. Ct. 734, 738 (1996); *Freedman* v. *Freedman, supra*. "It is the duty of the judge to consider the welfare of the child[ren] in reference not merely to the present, but also to the probable future . . . ." *Rolde* v. *Rolde*, 12 Mass. App. Ct. at 403, quoting from *Jenkins* v. *Jenkins*, 304 Mass. 248, 250 (1939). "The decision of which parent will promote a child's best interests 'is a subject peculiarly within the discretion of the judge.' " *Ardizoni* v. *Raymond, supra* at 738, quoting from *Bak* v. *Bak, supra*.

In the instant matter, the judge was cognizant of, and made reference to, the directive in G. L. c. 209C, § 10(*a*), that she preserve, *to the extent possible*, the relationship between the child and the primary caretaker.[9] As we have indicated, however,

---

[9]Although the judge found that the mother was the primary caretaker for

and as the language of § 10(*a*) makes clear, the directive, while evincing a general intent on the part of the Legislature to maintain the bonds between the child and her caregiver, is not conclusive on the question of custody. In addition to assessing the quality of the care provided by the primary caretaker, and the various factors specified in § 10(*a*) (see note 8, *supra*), a judge is to identify and weigh those factors pertinent to the child's best interests. Here, the judge's voluminous findings demonstrate consideration of myriad factors and circumstances relevant to the child's best interests, including the mother's refusal or inability to communicate with the father (in nonvisitation matters) for the benefit of the child,[10] the mother's poor judgment and worrisome parenting decisions, the father's active, substantial, and constructive involvement in the child's life, and the father's willingness to respect the mother's role as a parent.[11] See *Williams* v. *Massa*, 431 Mass. 619, 624, 636 (2000). In the light of the judge's findings, as previously described (and as more fully discussed, *infra*), which are "founded on a better knowledge of the parties than we can achieve from a cold record," *Matta* v. *Matta*, 44 Mass. App. Ct. 946, 947 (1998), quoting from *Bak* v. *Bak*, 24 Mass. App. Ct. at

---

the child, she noted specifically that the father cared for the child approximately thirty-eight percent of the year, or roughly four of every ten days.

[10]Joint custody was not feasible in the circumstances presented here. As we have stated (see note 8, *supra*), G. L. c. 209C, § 10(*a*), provides that a judge may award the parents joint custody of a child where the parents have entered into an agreement or the court finds that they have successfully exercised joint responsibility for the child and have the ability to communicate and plan with each other concerning the child's best interests. See *Rolde* v. *Rolde*, 12 Mass. App. Ct. at 404; *Doe* v. *Doe*, 16 Mass. App. Ct. 499, 502 (1983); *K.J.M.* v. *M.C.*, 35 Mass. App. Ct. 456, 457-458 (1993). Cf. *Williams* v. *Massa*, 431 Mass. 619, 636 (2000) ("If the judge felt that joint legal custody put the children at risk, or was not in their best interests, because of the wife's worrisome parenting behavior, then the judge should have ordered sole legal custody to the father"). *Carr* v. *Carr*, 44 Mass. App. Ct. at 925 ("Where the judge . . . [has] found that the relationship of the parties has been dysfunctional, virtually nonexistent, and one of continuous conflict, he properly [may] determine[] that custody should be awarded only to one parent"). It is clear from the court's findings that the judge believed that the father's participation in the major decisions in the child's life was important, if not essential, to the child's well-being.

[11]We note that our decision need not, and does not, turn on the "cultural" experiences (e.g., visits at an aquarium or a museum) that the father or the paternal grandparents may have provided the child. Cf. *Guardianship of Yushiko*, *ante* 157, 159 (2000).

617, we cannot confidently say that the judge abused her discretion or otherwise erred as matter of law in concluding that it was in the child's best interests to award legal and physical custody to the father.

3. A probate judge has substantial discretion in making custody orders. See *Freedman* v. *Freedman*, 49 Mass. App. Ct. at 521. That discretion is not without limit. "Error of law apparent on the record, such as the failure of a judge's findings to support the judge's action or findings that have no support in the evidence, would constitute an abuse of discretion." *Ibid.* With these principles in mind, the mother argues that several of the judge's "crucial" findings are unsupported by the evidence and require a reversal of the custody orders. See *Rosenberg* v. *Merida*, 428 Mass. at 191 (judge's findings in custody case must stand unless plainly wrong); *Guardianship of Clyde*, 44 Mass. App. Ct. 767, 774 (1998) (finding clearly erroneous when no evidence to support it or when, although there is evidence to support it, reviewing court left with definite and firm conviction that a mistake has been committed). While certain of the judge's findings might have been drawn more carefully, those weaknesses — to the extent they are such — do not vitiate the judgment.

(i) Arguably, the judge may have engaged in overstatement in her finding that the mother "does not value education for herself and for the child" (particularly in view of the mother's fulfillment of the GED requirements and her completion of work training), but there is evidence in the record that the parties have different values as to education and that the father places a higher value on books and education. It is apparent that the judge, in fashioning the finding, had in mind the mother's failure to engage the child in stimulating activities or to enroll the child in a day care program that would benefit and stimulate her.

(ii) The mother's challenge to the judge's finding that "[t]here is no history of domestic violence perpetrated by or upon either party" is not persuasive. The judge was aware of, and made findings concerning, the issuance of the earlier c. 209A orders.[12] We think it apparent, on review of the findings as a whole, that

---

[12]General Laws c. 209C, § 10(*e*), provides that a judge, in issuing any temporary or permanent custody order shall consider evidence of past or present abuse toward a parent or child as a factor contrary to the best interests of the child. Here, the judge found that the mother filed two complaints for protection from abuse — the first on October 28, 1996, which resulted in a

the judge considered the question of abuse and was of the opinion that the present case presented no history or pattern of domestic violence that would preclude an award of custody to the father. See and compare *Custody of Vaughn*, 422 Mass. at 596-600.[13]

(iii) The mother reads too narrowly the court's finding that she "has shown clearly that she dismissed the need of her daughter for a [f]ather and as a result *has denied him access* to [the child] and vice versa" (emphasis supplied). Rather than applying strictly to matters of visitation, we think that the finding, and the judge's use of the word "access," encompasses the mother's failure to involve the father in important decisions concerning the child.

(iv) As to the mother's assertion that there is no evidence to support the judge's finding that the child's sleeping in bed with her three or four times per week may create boundary issues and evidences the mother's inability to establish discipline or rules for the child, it is enough to say that the mother's own expert expressed some concern with the sleeping arrangements, noting that the situation could create "boundary" issues and that "developmentally, it's appropriate to have a child begin to learn to stay in their own bed."

(v) There is evidence in the record which supports directly, or from which the judge reasonably could infer, that the mother does not provide adequate stimulation for the child, drives routinely without a license, and has had the child in bed with her and her boyfriend.

4. We reject the mother's argument that the judge's findings and conduct during the trial reflect an "improper partiality" toward the father. Our review of the transcript and the judge's findings fail to disclose any statements, actions or conduct on the part of the judge that would support a claim of gender-based

---

temporary order that was vacated on the return date, November 4, 1996; the second on January 6, 1997, which resulted in a c. 209A order that was later extended. At the time of trial, there were no c. 209A orders in effect, and the mother testified that she was not in fear of the father.

The mother makes no argument that the father's conduct constitutes a pattern or serious incident of abuse that would give rise to the rebuttable presumption contained in § 10(*e*), and set out *supra*.

[13]While the father's past conduct toward the mother, particularly in the light of his criminal history, gives us pause, we note that the father participates in therapy for assistance in controlling his anger. The judge also found that the father has matured as a result of his responsibilities as a parent.

preference. See generally *Williams* v. *Massa*, 431 Mass. at 633. Similarly, we perceive no basis in the record to support the mother's claim that the custody award was the product of ethnic, cultural or class bias on the part of the judge. To the contrary, the judge's sensitivity to persons who are not in the plurality in our society is manifest in the provisions of the judgment. For example, the judge incorporates the parties' "agreement" to continue to foster the minor child's language development in both English and Spanish[14] and fixes visitation so as to accommodate the religious holidays of the parties or their families.[15] To the extent the mother perceives class bias in the custody decision, *Guardianship of Yushiko, ante* at 159, the judge found specifically that the parties' class differences were only an issue for the mother and that there was no credible evidence that the father or the paternal grandparents ever used any disparity in their educational backgrounds or home environments to the detriment of the child or to the disadvantage of the mother. Moreover, the judge's finding that the mother had been "vigorously represented" by publicly funded counsel, while the father's legal expenses had been paid by his parents (who were forced to take out a second mortgage on their home), seems more a response to the mother's claims at trial that she was the victim of a "power imbalance" than an example of class bias.

5. There is no merit in the mother's argument that the judge erred in admitting "offers of compromise" between the parties and counsel, such as a letter from the mother's lawyer to the father's lawyer declining to accept a change in day care arrangements. We agree with the father that his "offer" to assume full responsibility for the child's proposed care, albeit in Brookline, and schooling concerned matters bearing on the child's best interests and was independent of any settlement negotiations. As to the mother's claim that the judge erred by

[14]The paternal grandmother speaks Spanish and enjoys Spanish culture.

[15]We disagree with the following arguments of the mother. The mother perceives possible ethnic bias in the court's finding that she went out with her mother to "Spanish clubs." Yet, the language in the judge's finding simply tracks the mother's testimony at trial. The mother also perceives "unconscious" cultural bias in the judge's finding that the mother's sleeping with the child may create boundary issues. We have previously addressed the point but note, in addition, that the mother testified that she did not sleep when she was young with her own mother. Consequently, it is doubtful, on the facts of this case, that the child's sleeping with the mother could be viewed as a cultural phenomenon.

putting undue pressure upon her during the trial to reach agreement with the father concerning custody, it is apparent that the judge was simply affording the mother the opportunity to compromise in view of her risk of losing custody of the child.[16] The judge made clear that she was "not going to force" the mother to negotiate. Although the mother voiced some interest in attempting to negotiate the custody issue, when her attorney objected, the judge expressed her disappointment and ordered that the trial resume. At no time during the trial did the mother lack the benefit of counsel.

The mother's remaining contentions which, in large part, consist of single sentence assertions unsupported by citation to relevant authority, either do not constitute argument as contemplated by Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), see *Lolos* v. *Berlin*, 338 Mass. 10, 13-14 (1958), or would not require a reversal of the judgment.

6. As aspects of the mother's appeal raise issues of a substantial nature, we deny the father's request for appellate attorney's fees. Cf. *Moriarty* v. *Stone*, 41 Mass. App. Ct. 151, 160 (1996).

*Judgment affirmed.*

---

[16]It goes without saying that we encourage parental agreement in the sensitive area of child custody when it is possible and in the best interests of the child.