## T.E. *vs.* A.O.[1]

No. 11-P-246.

Suffolk. March 7, 2012. - October 9, 2012.

Present: Rubin, Brown, & Hanlon, JJ.

*Divorce and Separation,* Alimony, Division of property.

In a divorce action, the judge did not err in awarding the wife alimony, where
the judge considered and made detailed findings concerning each of the
factors set forth in G. L. c. 208, § 34; further, the judge did not abuse her
discretion in limiting the duration of the award of alimony. [592-596]
In a divorce action, the judge did not abuse her discretion in ordering the
husband to pay a certain sum as his contribution to the debt and diminished
assets incurred during the marriage, and this court declined to disturb the
judge's order to permit a different financial payment to the wife. [596-600]

COMPLAINT for divorce filed in the Suffolk Division of the
Probate and Family Court Department on April 17, 2009.

The case was heard by *Elaine M. Moriarty,* J.

*Matthew P. Barach (Elisabeth R. Feeney* with him) for the
husband.

*Dean Amrose* for the wife.

BROWN, J. By judgments of divorce nisi that were issued on
the former wife's complaint for divorce and the former husband's
counterclaim for divorce, a judge of the Probate and Family
Court ordered, among other things, that the husband pay the
wife in their short-term marriage (1) alimony in the amount of
$2,100 per month for a period of one year, and (2) the sum of
$29,500 as his "contribution to the debt and diminished assets
incurred during the marriage." Each party has appealed. We af-
firm the judgments.

---

[1]Certain impoundment orders have been entered in this case. We use ficti-
tious initials for the parties. See *T.M.* v. *L.H.,* 50 Mass. App. Ct. 856, 856 n.1
(2001). See and compare *Adams* v. *Adams,* 459 Mass. 361, 362 n.1 (2011).

1. *Background.* a. *The G. L. c. 208, § 34, findings.* The parties are highly educated professionals — the husband is a physician, and the wife holds a master's degree and is a department director. They met in late 2005 while working at the same medical facility. The wife had been previously married. By June, 2006, the parties' relationship had sufficiently developed so that the husband moved into the wife's apartment. The husband contributed $2,100 toward monthly rent and utilities; the wife paid the balance and "living expenses." In December, 2006, and prior to the marriage, the parties moved into a condominium unit in Boston that the wife purchased for $435,000, with a down payment of $43,500 from her own funds. While title to the property was briefly held in joint names, the parties in February, 2007, conveyed the real estate into the wife's sole name.[2]

Some five days prior to the parties' wedding on October 4, 2008, the husband went to Las Vegas for his bachelor party. There, he met a woman with whom he eventually would become romantically involved and further incurred a $20,000 charge at a "men's club." Upon the husband's return, the parties had a "lavish" wedding that cost approximately $150,000 and that was paid for, in large part, by the wife's parents.

The parties' marriage quickly deteriorated. The husband began an intimate relationship with the woman whom he had met in Las Vegas, and the wife learned both of the relationship and the $20,000 men's club charge.[3] In addition, the judge found there was poor communication between the parties, and the husband (notwithstanding his own spending excesses) was concerned with the wife's spending, all of which contributed to the breakdown of the marriage.

---

[2] The judge found that the wife took out an equity line of credit to pay for approximately $30,000 to $35,000 in improvements to the condominium unit made by the parties (e.g., the installation of central air conditioning and new appliances). By July, 2008, the husband's contributions to the household increased from $2,100 to $2,500 per month. The husband deposited these funds into a joint bank account maintained by the parties. The parties also maintained individual bank accounts. The wife transferred funds from the joint account to her individual account to pay the mortgage.

[3] The judge found that the costs incurred by the husband at the men's club were ultimately paid by the husband following the marriage, after a lawsuit was commenced for payment.

The parties separated on November 24, 2008, and, on December 15, 2008, the wife filed a complaint for separate support.[4] Meanwhile, the wife's distress over the breakup of the marriage began to impact her functioning at work, and she started to see a psychiatrist in January, 2009.[5] Over the ensuing months, the wife, at times, would cry uncontrollably; she had difficulty concentrating at work, sleeping, and eating. In February and March, 2009, the wife was not working "full time days," although it initially did not affect her income. By May, 2009, however, the wife's income had changed as a result of her absences, and she took a leave from her employer and began to receive disability income.[6] The wife also sold the condominium unit in May, 2009,[7] for $465,000 and netted $397,319 after payment of the broker fees, the equity line of credit, and the closing costs. This resulted in a net loss of $37,000 from the original purchase price of $435,000.

In June, 2009, the wife's condition, as described by her psychiatrist, continued to worsen. She was hospitalized on June 15 after she came to her psychiatrist's office unable to speak. Shortly thereafter, the wife received inpatient treatment at two facilities in Arizona, the combined cost of which was $81,000. After her return to Massachusetts, and by November, 2009, the wife was deemed to be "more in control and more able to plan." She was able to return to work part time.

Following the parties' separation, the husband left his position at the medical facility in Massachusetts, in part because of

---

[4]After the husband filed his answer to the wife's complaint for separate support, and a counterclaim for divorce, the wife moved to amend her complaint "as set forth in [her] amended complaint for divorce submitted herewith." When her motion was denied, the wife filed a separate complaint for divorce which bears a Probate and Family Court docket number different from the separate support case. The husband thereafter filed a counterclaim for divorce.

[5]The judge also found that shortly after the parties' separation, the husband wired $2,000 to the woman he had met in Las Vegas, an action that was "greatly unsettling" to the wife. The judge characterized the payment as not a loan, but more likely a gift.

[6]As noted by the judge, the wife's psychiatrist stated that the wife was "shattered" and "depressed" by the breakup of the marriage. She was initially diagnosed with "Acute Stress Reaction," but that diagnosis was later changed to "Post Traumatic Stress Disorder."

[7]The wife testified that she sold the property because she could no longer afford it.

the inherent difficulties in working at the same location as the wife. He relocated to California to be in closer proximity to the woman he had met in Las Vegas and obtained employment as a physician. The husband's savings were substantially reduced when he moved to California, as he did not work during the several-month period before he obtained his California medical license.

At the time of trial in December, 2009, the husband was thirty-eight years old and in good health. He earns $160,000 per year, or $3,076 per week (a reduction from his previous salary at the Boston medical facility), and is eligible to earn an additional $22,400 from a performance-based bonus. He may also receive extra compensation for undertaking additional work and seeing additional patients. The husband lists weekly expenses of $2,061 or $2,361[8] and assets with a total combined value of $20,000. The husband's liabilities, including medical school loans, amount to $155,500.

The wife is thirty-nine years old and suffers from posttraumatic stress disorder, anxiety, and depression. She continues to see her psychiatrist on a regular basis, and her condition has improved.[9] The wife's current yearly salary is $113,000, but because she is on medical leave and works about twenty-six hours per week, she receives approximately $75,000 per year or $1,430 per week.[10] While the wife previously had $100,000 to $120,000 in a stock account, the value of that account had been reduced to $25,000 by the time of trial. The wife's current assets have a combined value of $68,700, and her liabilities amount to $159,869.72.

The judge found that neither party specifically contributed to the other's acquisition of assets, and other than a joint account

---

[8]The husband's expenses include temporary alimony for the wife in the amount of $146 per week, which was entered to assist the wife in carrying the condominium unit expenses and which continued subsequent to the sale of the condominium unit and through trial.

[9]The judge noted that the wife's psychiatrist testified that she considered the wife's long-term prognosis to be fair to good. The psychiatrist was hopeful that the wife could return to work full time but stated that it would take a few years to put the separation and divorce in perspective.

[10]Although the wife currently works part time, she retains her full-time position, to which she is able to return.

used to maintain the condominium unit and pay household expenses, the parties kept their individual assets separate. The parties largely paid for their own personal expenses separately.

Finally, the judge found that when the parties were together they enjoyed an upper middle class station in life and that they should be able to maintain that station following the divorce. Although the husband will likely continue to have a have a "higher earning power," both parties should be able to support themselves and acquire assets in the future.

b. *The rationale and judgments.* We touch on salient points set out in the judge's extensive rationale for decision. At the outset, the judge stated that given the brevity of the parties' relationship, they never had time to come together to form a marital partnership or to acquire a marital estate. The judge also commented at length on the wife's contention that the husband's conduct caused the breakup of the parties' marriage and left her in an emotional state that resulted in her being unable to work full time and caused her to incur substantial health-related expenses that will continue into the future.[11] Although the wife asserted that the husband should be responsible for "the economic consequences of his infidelity," the judge opined that "[a]ll of the responsibility of the breakdown of the marriage cannot be placed solely on Husband's conduct," and "[w]hile Husband's conduct, coming on the heels of the wedding, was the immediate factor in the breakup of the marriage, and while the breakup was abrupt, nonetheless I do not find the medical testimony persuasive that it was the sole or even principal cause of [the wife's] health issues." The judge further stated that the wife has suffered "multiple emotional experiences" (which we need not recount here), all of which are given little weight in the medical testimony in terms of the individual or cumulative impact on the wife's emotional health.[12] Finally, the judge indicated that while the wife's anger with the husband was understandable, the judge could not (as the wife acknowledged in her proposed

[11]The judge noted that the wife's psychiatrist testified that the wife's emotional state resulted from the husband's "betrayal" during the marriage.

[12]The judge noted that the husband's testimony suggested, as we have indicated, that communication between the parties was sometimes poor, and the husband had reservations concerning the marriage, although he did not share those reservations with the wife.

findings) award property or order support based solely on the fault of one party.

After discussing, among other things, the parties' financial practices during the marriage (including their general practice of keeping their individual finances separate except their joint account for household expenses), the absence of "joint property" to divide, the absence of "joint debts" and the relative comparability of the parties' individual debt levels, and the sale of the condominium unit, the judge stated that "[b]ut for the issue raised by [the] wife about her health, this would be an appropriate case to return each party to status quo ante by having them keep their separate assets and separate income."[13] Continuing, the judge stated:

> "I consider that Husband expended at least $22,000 during the marriage in connection with his involvement with [the woman he met in Las Vegas] and at a men's club and that Wife after selling the [condominium unit] for a gain on paper actually netted about $37,000 less than the original purchase price (after considering broker's commission and home equity). It is equitable that Husband make some contribution to the diminished assets and accordingly he is to pay Wife the sum of $29,500 (1/2 of $59,000) with one half payable in six months and one half payable six months after that. Husband has the greater salary and the potential to obtain a bonus. His contract does not prohibit his taking on additional work as he has in the past . . . . Even though he has reduced his own assets during the marriage, given his salary he is in a position to arrange to pay Wife this contribution toward debt and it is equitable that he do so."

The judge also concluded that while the husband's conduct was not the sole or overriding reason for the wife's health issues, the wife "does have some emotional health issue which will require some recuperative period and for which she will need some support."

---

[13]We note that there is authority for the proposition that a disposition that restores the parties to the status quo ante often will make eminent sense in a marriage of short duration. See *Putnam* v. *Putnam*, 5 Mass. App. Ct. 10, 14 (1977).

By judgments of divorce nisi dated April 20, 2010, the wife was awarded a divorce for the cause of adultery; the husband was awarded a divorce for irretrievable breakdown of the marriage. The judgments provided that the wife should retain the net proceeds from the sale of the condominium unit. The husband was ordered to pay the wife as alimony the sum of $2,100 per month (beginning May 1, 2010) for a period of one year.[14] The husband was further ordered to pay the sum of $29,500 as his contribution to "the debt and diminished assets incurred during the marriage." Each party was otherwise allowed to retain the assets in his or her possession and was to be responsible for his or her own liabilities.

2. *Discussion.*[15] a. *Alimony.* "In making a property division and alimony determination under G. L. c. 208, § 34, a judge must make findings indicating that he has considered all factors relevant under § 34, and has not considered any irrelevant factors." *Bowring* v. *Reid,* 399 Mass. 265, 267 (1987). "While the judge must consider and weigh all the factors, she must keep in mind that 'the statutory authority of a court to award alimony continues to be grounded in the recipient spouse's need for support and the supporting spouse's ability to pay.' " *Pierce* v. *Pierce,* 455 Mass. 286, 296 (2009), quoting from *Gottsegen* v. *Gottsegen,* 397 Mass. 617, 624 (1986).

If a judge has made findings consistent with the obligations imposed by § 34, a judgment for alimony may not be reversed

---

[14]As we shall discuss, the judge rejected the wife's request for alimony from the husband in the amount of $700 per week for a period of two to three years, the length of time her psychiatrist considered it would take her to recover. The judge also indicated that the weekly expenses listed by the wife (amounting to approximately $3,200) were inflated and explained how they could be reduced. The judge stated that an alimony award of $2,100 monthly would bring the wife "close to meeting weekly expenses at an expense level comparable to Husband which [the judge found] to be more realistic." The judge noted that the alimony award would be subject to modification by either party should circumstances change materially.

[15]The wife has moved to dismiss the husband's appeal for "lack of jurisdiction" for the reason that he failed to comply with Mass.R.A.P. 4(a), as amended, 430 Mass. 1603 (1999). In view of apparent clerical errors in this matter, the confusion and uncertainty as to the docketing of the judgments and certain papers, and the fact that the husband initially filed a notice of appeal from the judgments of divorce nisi, we deny the motion to dismiss. We note that the merits of the appeals have been fully briefed.

unless "plainly wrong and excessive." *Bowring* v. *Reid*, 399 Mass. at 267, quoting from *Redding* v. *Redding*, 398 Mass. 102, 107 (1986).

We turn first to the husband's argument concerning the order for alimony. Pointing to the language of the judge's rationale that "[b]ut for the issue raised by Wife about her health, this would be an appropriate case to return each party to status quo ante by having them keep their separate assets and separate income," the husband states that the judge "made clear" that alimony was only appropriate because of the wife's fragile emotional health. Thus, the husband asserts, "without Wife's mental health problems, the court would not have awarded alimony." In the husband's view, the judgment must be reversed "because it is based entirely on Wife's emotional health without due regard to the other statutory factors" contained in G. L. c. 208, § 34. See *Pierce* v. *Pierce*, *supra* at 295. The husband also argues that an application of the § 34 factors (including, in his view, an absence of "need" on the part of the wife) demonstrates that this case is not an appropriate one for an award of alimony.[16] See *id.* at 295-296, and cases cited therein. We discern no error.

The husband reads too narrowly the judge's statement in her rationale for decision. The judge did, in fact, consider and make detailed findings concerning each of the § 34 factors, and discussed a number of those factors specifically in her rationale in the context of the alimony award. It is apparent that the judge, in according weight to the wife's emotional health issues, viewed that factor as the proverbial stone thrown into the pond, its ripple effects touching on other factors, including the wife's present ability to work full time, her current income, and her needs.

The husband's remaining arguments challenge, in large part, the weight the judge accorded to each of the § 34 factors, a matter that is "committed to the judge." *Ross* v. *Ross*, 385

---

[16]Though the husband, in his brief, does not characterize the order for short term alimony as such, "[t]ypically, alimony awards of limited duration are intended to be 'rehabilitative.' " *Ross* v. *Ross*, 50 Mass. App. Ct. 77, 80 (2000). *Adlakha* v. *Adlakha*, 65 Mass. App. Ct. 860, 869 (2006). See generally Kindregan & Inker, Family Law and Practice § 38.11 (3d ed. 2002).

Mass. 30, 37 (1982), quoting from *Langerman* v. *Langerman*, 9 Mass. App. Ct. 869, 870 (1980). Certain of the husband's contentions, however, merit additional comment. The husband asserts that "[t]he brevity of this marriage [effectively seven weeks] must preclude alimony," in that there was no time to form a marital station or standard of living. In so arguing, he invokes the oft-repeated language that "[t]he standard of need [in an alimony case] is measured by the 'station' of the parties — by what is required to maintain a standard of living comparable to the one enjoyed during the marriage." *Grubert* v. *Grubert*, 20 Mass. App. Ct. 811, 819 (1985). *Moriarty* v. *Stone*, 41 Mass. App. Ct. 151, 158 (1996). It is the husband's position that "[w]hen no standard of living is established, no alimony is required to maintain it."

The judge found that this was a very brief marriage. While "[i]n general, the shorter the marriage the less justification for alimony," Kindregan & Inker, Family Law and Practice § 38.3, at 615 (3d ed. 2002), a short-term marriage does not necessarily preclude an alimony award. See *Freedman* v. *Freedman*, 49 Mass. App. Ct. 519, 523 (2000) (alimony may be appropriate to a short-term marriage). As we have observed, all the § 34 factors must be considered; no single factor is determinative. See *Gottsegen* v. *Gottsegen*, supra at 623. See also *Gordon* v. *Gordon*, 26 Mass. App. Ct. 973, 975 (1988); Kindregan & Inker, *supra* (in determining an alimony award other factors, in addition to the length of the marriage, come into play). It is also apparent that the judge had in mind the so-called "station/standard" of living of the parties. Among other things, the judge found that "[w]hen together [the] parties enjoyed an upper middle class station in life,"[17] that they each leased a BMW automobile, and that although both parties will experience some economic setback as a result of the divorce, they both will likely be able to maintain an upper middle income lifestyle.

---

[17]Although the judge makes reference in her findings concerning the parties' "station" to aspects of the parties' premarital lifestyle, she did not limit specifically her finding concerning the parties' station to their premarital standard of living. As a practical matter, the parties' marriage brought little change in their lifestyle. They continued to earn substantial incomes, to live in a condominium unit worth almost one-half million dollars, to lease expensive automobiles, and to travel.

Furthermore, in fashioning her award for alimony of limited duration, the judge sought to provide the wife with support to meet her "realistic" needs (as found by the judge, see note 14, *supra*) for a period that would allow her to recover sufficiently from her emotional health issues to engage again in full-time employment. In the circumstances of this case, and as discussed further, *infra*, we do not think that the judge's order constitutes an abuse of discretion.

We comment briefly on the wife's challenge, through her cross appeal, to the durational limits to the alimony award. Starting with the premise that the husband's conduct triggered "extreme consequences to [her]," both emotional and financial, the wife asserts that "accommodation" is appropriate here to provide financial assistance to her for as long as is necessary.[18] In support of her position, the wife notes, inter alia, that until the recent amendments to G. L. c. 208, alimony awards of limited duration were "viewed with some circumspection in Massachusetts," see *Bak* v. *Bak*, 24 Mass. App. Ct. 608, 622 (1987); *Adlakha* v. *Adlakha*, 65 Mass. App. Ct. 860, 870 (2006),[19] and that "an arbitrary limitation on the duration of an alimony obligation to a spouse whose needs are current and predictable is unwarranted when based on an assumption of future events, the occurrence of which is uncertain or unpredictable." *Sampson* v. *Sampson*, 62 Mass. App. Ct. 366, 371 (2004), quoting from *Katz* v. *Katz*, 55 Mass. App. Ct. 472, 482-483 (2002). She requests that we reverse the durational component of the alimony award and remand the matter to the Probate and Family Court for further proceedings, including the taking of "further

[18]While stating that adultery is not "dispositive" on issues relating to property division and alimony, see, e.g., *Putnam* v. *Putnam*, 5 Mass. App. Ct. at 15-16; Kindregan & Inker, *supra* at § 38:3, at 619, the wife argues that there were financial consequences in this case as a result of the husband's infidelity.

[19]The amendments to G. L. c. 208, effectuated by St. 2011, c. 124 (see G. L. c. 208, §§ 34, 48-55), effective March 1, 2012, have changed the landscape of alimony in the Commonwealth. By virtue of the amendments, and except upon a written finding by the court, there are now durational limits for general term alimony that are tied to the length of the parties' marriage. The amendments also contain provisions for rehabilitative, reimbursement, and transitional alimony.

evidence" to determine the wife's continuing financial need for support and the husband's ability to satisfy that need.

As to the wife's assertions with respect to the husband's conduct, we note that the judge stated expressly that she did not find that the husband's conduct was the sole or even principal cause of the wife's health issues. That aside, to the extent the wife now urges that the present case is not an appropriate one for an award of limited duration alimony, her position is at odds with her request for short-term alimony in her opening statement at trial and her further request (as the judge noted) for alimony in the amount of $700 per week for a period of two to three years.

Here, although the judge found that the wife has emotional health issues that will require some recuperative period for which she will need some support, the judge did not find persuasive the medical testimony that the wife will need up to three years to recover. The judge stated that the wife had been in treatment for some sixteen months, that she was currently able to work twenty-four to twenty-six hours per week, and that she herself acknowledged that her emotional health should improve and that she should be able to return to work full time. In the circumstances, the judge did not abuse her discretion or otherwise err as matter of law in ordering that the husband pay the wife alimony for a period of one year.

b. *Property division.*[20] General Laws c. 208, § 34, as amended by St. 1990, c. 467, provides, in part: "In addition to or in lieu of a judgment to pay alimony, the court may assign to either husband or wife all or any part of the estate of the other . . . ." The term "estate" has been interpreted to include "all property to which a party holds title, whenever and however acquired, and includes property obtained by a party before

---

[20]Both parties proceed on the theory that the judge's order for payment of $29,500 constitutes a property division under G. L. c. 208, § 34. We note that in fashioning the order for payment, the judge's rationale suggests that she had in mind the husband's reduced assets and his income as potential sources for payment. The husband makes no argument (certainly no meaningful argument) as to the fact that the judge's order requires payment of a sum that exceeds the value of his current assets and may implicate his income. Nor does he raise any specific argument that the order, even arguably, may involve after-acquired property. We thus do not comment further on these points.

marriage." *Moriarty* v. *Stone,* 41 Mass. App. at 156-157. "The equitable factors which are to be considered under § 34 reflect a view of marriage as an implied partnership for the purposes of distribution of property." *Savides* v. *Savides,* 400 Mass. 250, 252 (1987). See *Davidson* v. *Davidson,* 19 Mass. App. Ct. 364, 369-370 (1985). "Overall, the purpose of a § 34 property division is 'to recognize and equitably recompense the parties' respective contributions to the marital partnership.' " *Kittredge* v. *Kittredge,* 441 Mass. 28, 44 (2004), quoting from *Heacock* v. *Heacock,* 402 Mass. 21, 24 (1988). See *Moriarty* v. *Stone,* 41 Mass. App. Ct. at 157 ("The parties' respective contributions to the marital partnership remain the touchstone of an equitable division of the marital estate"). See generally Kindregan & Inker, *supra* at § 40:6. "According broad discretion to the judge's division of property under the § 34 factors 'is necessary in order that the courts can handle the myriad of different fact situations which surround divorces and arrive at a fair financial settlement in each case.' " *Kittredge* v. *Kittredge,* 441 Mass. at 43-44, quoting from *Rice* v. *Rice,* 372 Mass. 398, 401 (1977). *Adams* v. *Adams,* 459 Mass. 361, 371 (2011).

As a preliminary matter, the husband argues that the property division must be set aside as inconsistent with the judge's findings of fact. He first asserts that the judge incorrectly stated in her rationale that he had spent "at least $22,000 *during* the marriage" (emphasis supplied) in connection with his involvement with the woman he met in Las Vegas and at the men's club, when, in fact, the parties stipulated that the men's club bill was incurred *prior* to the marriage.

The judge found that the men's club costs were incurred by the husband about five days before the parties' wedding. In context, it is apparent that the judge's statement in her rationale refers to the fact that the husband paid the sum of $20,000 in settlement of the men's club charges *during* the marriage. As to the husband's additional challenge to the judge's findings of fact, although the judge stated at one point that "[t]he only asset acquired together *during* the marriage, their condominium, has been sold" (emphasis supplied), the judge was well aware that the condominium unit was purchased prior to the marriage, and she made findings with respect to the purchase and the par-

ties' use of the condominium unit as their residence both before and during the marriage.

In arguing that the judge failed to evaluate the totality of the parties' financial situations, the husband asserts briefly, and in general terms, that the judge erred "by enriching the wife in the absence of [as found by the judge] a marital partnership or [marital] estate." He argues that a judge "may not apportion shares of a marital estate to one spouse without relation to that spouse's contribution," and that the judge, in the present case, "failed to explain why, in the absence of a marital estate, a contribution was required."

While the concept of marital partnership may be said to form a basis for a division of property, we have indicated that the absence of such a partnership does not, in itself, prohibit a judge from fashioning in appropriate circumstances orders for property division. See *Freedman* v. *Freedman*, 49 Mass. App. Ct. at 524 (in fashioning the financial components of the judgment, which included a division of property, the judge "could take into consideration that the marriage had not lasted long enough to attain the character of a marital partnership"). Moreover, the judge's finding that given the brevity of the relationship the parties were never able to acquire a "marital estate," in context, appears to reflect the judge's view that there was no property that was the product of the marriage itself.[21] It is settled, however, that "the court may assign to one party in a divorce proceeding all or part of the separate nonmarital property of the other" (i.e., "property not derived from the marital partnership"). *Rice* v. *Rice*, 372 Mass. at 400-401. See Kindregan & Inker, *supra* at § 40:15, at 39 ("Unlike other states, Massachusetts does not make a distinction between marital property and separate property, but includes all property in which each party has an interest in the estate which is subject to possible assignment"). As we have stated, in making a property division, a judge must consider all factors relevant under § 34. See *Freedman* v. *Freedman*, *supra*.

In concluding that it was equitable for the husband to pay the wife the sum of $29,500 as his contribution to the diminished

---

[21] In the "estate" section of her findings, the judge set out the assets held individually by each party.

assets and "debt," the judge considered the § 34 factors, and in doing so, made findings concerning, as we have discussed, the men's club expenditures paid by the husband during the marriage,[22] the $2,000 gift to the woman the husband met in Las Vegas that was made during the parties' separation, and the parties' involvement with the condominium unit and the net loss sustained by the wife upon her sale of the property. In the face of the unusual circumstances presented here (and upon consideration of the specific arguments made on appeal),[23] we cannot fairly conclude, in light of the discretion accorded the judge in such matters, that the judge's order for payment of $29,500, was error.

On her cross appeal, the wife argues that "[i]n a short term marriage, where the immediate cause of the parties' breakup was the husband's infidelity resulting in significant and substantial losses to [her] . . . it was an abuse of discretion *to limit* a division of property to [her] of $29,500" (emphasis supplied). The wife requests that the case be remanded with instructions that the judge review and revise the property division to award her appropriate sums on account of her medical treatment (and particularly her treatment at the Arizona facilities at a cost to her of $81,000).[24] Here, the judge considered the § 34 factors, including the husband's conduct, which, again, the judge found was neither the sole nor overriding reason for the wife's health

---

[22]At oral argument the husband engaged in some discussion with the panel concerning the accounts and funds from which the husband ultimately paid the men's club bill. We decline to consider the husband's arguments on these points, as they were not raised in his brief. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975) ("The appellate court need not pass upon questions or issues not argued in the brief").

[23]The husband's remaining arguments either fail to constitute reasoned appellate argument or would not require a reversal of the judgment. In particular, we note that to the extent the husband argues that he, as the support provider, must deplete his liquid assets to maintain the wife's lifestyle, he ignores the judge's findings concerning his income and his opportunity to earn additional income under his contract. It is also apparent, contrary to the husband's assertion, that the judge did consider the totality of the parties' financial situations.

[24]The wife appears to acknowledge in her brief that "marital assets" may not exist to apportion to her to meet her "financial loss[es] and needs." She also appears to assert that the husband should be ordered to contribute to her costs for ongoing care. We note that the judge found that the wife's continued doctor's visits "are anticipated to be covered by insurance."

issues. Moreover, the judge made specific findings concerning the wife's medical treatment at the Arizona facilities, stating, inter alia, that there was "no evidence of why [the wife] needed to be treated in Arizona or whether less expensive facilities were available in Massachusetts." For these reasons, if no other, we decline to disturb the judge's order for a different financial payment to the wife.

3. *Conclusion.* The judgments are affirmed. The wife's request for appellate attorney's fees and costs is denied.

*So ordered.*